UNITED STATES v. SOULE and others.

(*Circuit Court, D. Kansas.* 1887.)

COURTS—JURISDICTION—DISTRICT COURT OF KANSAS—"CHEROKEE OUTLET"—
MURDER.
The "Cherokee Outlet" is within that portion of the Indian territory placed within the jurisdiction of the United States district court of Kansas by the act of congress of January 6, 1883, (22 St. U. S. 400,) and jurisdiction of a murder committed there is in that court, and not in the district court for the Western district of Arkansas.

Indictment for Murder. On plea to the jurisdiction. Certified.
*W. Perry*, U. S. Dist. Atty., for plaintiff.
*Henry T. Sumner* and *D. W. C. Duncan*, for defendants.

BREWER, J. The defendants were indicted in the district court of the district of Kansas for murder. They filed a plea challenging the jurisdiction of that court. That plea has been certified to this court for decision. The question presented is whether the district court had jurisdiction of the place at which the offense is charged to have been committed. The place is described in the indictment as "within that part of the Indian

territory lying north of the Canadian river, and east of Texas and the one hundredth meridian, not set apart and occupied by the Cherokee, Creek, and Seminole Indian tribes, and at that part of the territory known as the "Cherokee Outlet." Prior to January 6, 1883, unquestionably the entire Indian territory was within the jurisdiction of the district court of the Western district of Arkansas. On that day an act was passed (22 St. U. S. 400) providing for one term of the United States district court for the district of Kansas to be held at Wichita, a place near the southern boundary of the state of Kansas. Section two of that act provides as follows:

"That all that part of the Indian territory lying north of the Canadian river, and east of Texas and the one hundredth meridian, not set apart and occupied by the Cherokee, Creek, and Seminole Indian tribes, shall, from and after the passage of this act, be annexed to and constitute a part of the United States judicial district of Kansas, and the United States district courts at Wichita and Fort Scott, in the district of Kansas, shall have exclusive original jurisdiction of all offenses committed within the limits of the territory hereby annexed to said district of Kansas against any of the laws of the United States now or that may hereafter be operative therein."

Unquestionably by this section a portion of the Indian territory was placed within the jurisdiction of the district court of Kansas, and the question is whether the Cherokee outlet is within this portion. As significant of the intent of congress, the third section is important. It reads as follows:

"That all that part of the Indian territory not annexed to the district of Kansas by this act, and not set apart and occupied by the Cherokee, Creek, Choctaw, Chickasaw, and Seminole Indian tribes, shall, from and after the passage of this act, be annexed to and constitute a part of the United States judicial district known as the Northern district of Texas, and the United States district court at Graham, in said Northern district of Texas shall have exclusive original jurisdiction of all offenses committed within the limits of the territory hereby annexed to said Northern district of Texas, against any of the laws of the United States now or that may hereafter be operative therein."

It will be seen from these two sections, taken in conjunction with the prior statutes vesting jurisdiction over the entire territory in the district court of the Western district of Arkansas, that the intent of congress was to apportion the territory between the three courts; and we should naturally expect, in the absence of cogent reasons for the contrary, that the entire portion of the territory contiguous to the place of holding court in each district, respectively, would be assigned to that district. It is unquestionable that the entire south-western portion goes to the Texas district court, and the entire eastern portion to the Arkansas court, and therefore the entire north-western portion we should expect to find assigned to the Kansas court. The intent of the law-maker, of course, controls in the interpretation of a statute; and the geographical argument as to that intent is in this case most potent. The convenience and economy of business require that the territory subject to the jurisdiction of a court should be as near as possible to the place where the court is held, and the very distribution of the territory is evidence that congress had this matter of

economy and convenience in mind. Now, if the Cherokee outlet remains attached to the district of Arkansas for jurisdictional purposes, there is a long strip of territory, far removed from the place of holding that court, into which its process must run; and, further, this same strip stands intermediate between that portion assigned to the Kansas court and the place at which that court is held.

With this potent geographical fact before us, we pass to an examination of the language of the section, and the significant words are these: "That part of the Indian territory lying north," etc., "not set apart and occupied by the Cherokee, Creek, and Seminole tribes." Beyond the mere matter of geography, there is a double description in this definition of territory. This is indicated by the two terms, "set apart" and "occupied." These are joined by the copulative, and not by the disjunctive, conjunction. Both facts evidenced by these words must exist to exclude the territory from the jurisdiction of the Kansas court. It will not be assumed that either term was superfluous, or that some distinctive fact was not in the mind of congress in the use of each. A tract occupied, but not set apart, would not be excluded. So, also, as to a tract set apart, but not occupied. What were the facts evidenced by these respective terms? We go back to the treaty of 1828, (7 U. S. St. at Large, 311.) The preamble of that treaty recites: "Whereas, it being the anxious desire of the government of the United States to secure to the Cherokee nation of Indians a permanent home," etc. Article 2 then reads: "The United States agree to possess the Cherokee nation, and to guaranty it to them forever, and that guaranty is hereby solemnly pledged of seven millions of acres of land, to be bounded as follows." Then follows a description by metes and bounds of the tract above indicated, of 7,000,000 of acres. Then, in the same article, are these words: "In addition to the seven millions of acres thus provided for and bounded, the United States further guaranty to the Cherokee nation a perpetual outlet west, and a free and unmolested use of all the country lying west of the western boundary of the above-described limit, and as far west as the sovereignty of the United States and their right of soil extends." The treaty of February 14, 1833, (7 U. S. St. at Large, 414,) reiterates the same grants; attaches to the provision quoted for outlet, etc., a proviso, "If the saline or salt plain on the great western prairie shall fall within said limits, the right is reserved to the United States to permit other tribes of Red Men to get salt on said plain in common with the Cherokees;" and also that letters patent shall be issued as soon as practicable for the land so guarantied. Subsequent treaties have reduced the boundaries of this 7,000,000 tract, and also provided for cessions of some portion of the territory west to other tribes. In pursuance of this treaty, patent was issued for all the lands, including the outlet west. No distinction was made in the granting clause between the 7,000,000 tract and the outlet west.

Now, is this outlet, within the meaning of the act of 1883, "set apart and occupied" by the Cherokee nation? That it was set apart to that nation is evident; but was it occupied? Doubtless, in a certain sense,

it was occupied, because the Cherokee nation had a title and right to possess it; but, if congress had meant by this act to include all land owned by the Cherokees, the words "set apart" would have been ample, and the word "occupied" was superfluous. Obviously, some distinctive matter was intended to be expressed by the use of that word. The significance of it is evident, from the language of the proviso in article 2, heretofore quoted. Manifestly congress set apart that 7,000,000 acres as a home, and that was thereafter to be regarded as set apart and occupied, "because," as expressed in the preamble of the treaty, "congress was intent upon securing a permanent home." Beyond that, the guaranty was of an outlet,—not territory for residence, but for passage ground over which the Cherokees might pass to all the unoccupied domains west. But while the exclusive right to this outlet was guarantied, while patent was issued conveying this outlet, it was described and intended obviously as an outlet, and not as a home. So, whatever rights of property the Cherokees may have in this outlet, it was not territory set apart for a home, and is not territory, within the language of the act of 1883, "set apart and occupied" by the Cherokee tribe. I think, therefore, that the district court of Kansas had jurisdiction over the territory in which this offense is charged to have been committed.

I am aware that in the case of *U. S.* v. *Rogers*, 23 Fed. Rep. 658, Judge PARKER of the Western district of Arkansas has expressed a different conclusion, and has held that the jurisdiction over this outlet still remains in the district court for the Western district of Arkansas. I have given his careful and elaborate opinion thorough study; and while, according to that opinion, the consideration which its careful preparation, and which the distinguished ability of that learned judge, compels, I am unable to yield to the force of his reasoning. Both the geographical argument and the double description in the act of 1883 lead me to a different conclusion, and to hold that the jurisdiction over the outlet is vested in the district court of Kansas. The plea to the jurisdiction of the district court will therefore be overruled, and the case certified back to that court for trial.